IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

CIVIL ACTION FILE NO. _____

| | | |
|---|---|---|
| MICHAEL P. SHEPARD and MELISSA J. SHEPARD, | ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **COMPLAINT** |
| | ) | |
| LUCID GROUP USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiffs Michael P. Shepard and Melissa J. Shepard ("Shepards" or "Plaintiffs"), for their Complaint against Defendant Lucid Group USA, Inc. ("Lucid" or "Defendant"), state and aver as follows:

## PARTIES, JURISDICTION, AND VENUE

1. The Shepards are citizens and residents of Cherokee County, North Carolina.

2. Lucid is a Delaware corporation with its principal place of business in Newark, California. Lucid is registered to do business with the North Carolina Secretary of State and does, in fact, transact business in the State of North Carolina, including marketing, selling, delivering, and servicing vehicles in the western region of the State of North Carolina.

3. The Court has personal jurisdiction over the parties.

4. The Court has subject matter jurisdiction over the action based on diversity jurisdiction and federal question jurisdiction.

1

5.     The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

7.     Lucid designs, builds, and sells luxury electric vehicles, including an electric sedan known as the Lucid Air.

8.     In September 2022, the Shepards entered into a Purchase Agreement (the "Agreement") with Lucid for the purchase of a new 2022 Lucid Air Grand Touring, VIN# 50EA1GBA4NA004498 (the "Vehicle"). A true and accurate copy of the Agreement is attached hereto and incorporated herein by reference as **Exhibit A**.

9.     In exchange for the Vehicle, the Shepards paid Lucid $145,198. 60.

10.    On September 28, 2022, Lucid delivered the Vehicle to the Shepards and the Shepards took possession therewith.

11.    Pursuant to the Agreement, the Vehicle was covered by the Lucid New Vehicle Limited Warranty (the "Warranty"). A true and accurate copy of the Warranty is attached hereto and incorporated herein by reference as **Exhibit B**.

12.    The Warranty states on Page 4:

> Lucid will, without charge and as determined by Lucid at its discretion, repair, replace, or adjust all parts on your new vehicle that malfunction or fail during the normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship provided your vehicle has been

2

properly operated and maintained in accordance with all requirements in the owner's manual and any other documentation we may provide you, and was taken to a Lucid Service Center for a warranted repair during the warranty period.

13.     At the time of the delivery of the Vehicle, a Lucid employee Felipe Luisi ("Luisi") was present and inspected the Vehicle. During that inspection, Lucid, by and through Luisi, admitted that the Vehicle contained multiple manufacturing defects in factory-supplied materials or factory workmanship, including noticeable paint chips, stained carpet, and damaged trim. These defects were defects explicitly covered under the Warranty and the responsibility of Lucid.

14.     Upon information and belief, Lucid was aware, or reasonably should have been aware, of the Vehicle's defects prior to the Shepards' purchase of the Vehicle.

15.     The Shepards were unaware of the Vehicle's defects prior to their purchase of the Vehicle.

16.     Luisi documented the defects, took photographs of the defects, and assured the Shepards that the defects were Lucid's responsibility, covered under the Warranty, and would be repaired, at cost, to Lucid.

17.     Lucid induced the Shepards to accept delivery of the Vehicle despite the Vehicle's defects by assuring the Shepards that the defects were covered under the Warranty and that Lucid would repair the Vehicle.

18.     Upon information and belief, Lucid had no intent to repair the defects or honor its Warranty.

3

19.     In reliance on Lucid's assurances that the defects were covered under the Warranty and would be repaired by Lucid, the Shepards accepted delivery of the Vehicle.

20.     On September 29, 2022, a different Lucid employee, acting on Lucid's behalf, contacted the Shepards via email and requested photographs of the defects. Mr. Shepard responded the same day, informing the Lucid employee that Lucid had that documentation in its possession due to the Lucid representative's documentation and admissions on the day of delivery.

21.     Following this correspondence on September 29, 2022, Lucid failed to substantively respond or provide any update to the Shepards.

22.     Mr. Shepard followed up with Luisi numerous times over the course of for several months.  Neither Luisi nor Lucid ever responded to Mr. Shepard, or otherwise updated the Shepards about the defects.

23.     Following several months of attempted communications, Lucid Service Center eventually called Mr. Shepard in early 2023.

24.     Despite it being several months since the original documentation and Lucid's admission regarding the defects, the call from Lucid Service Center provided no substantive update. The Lucid Service Center simply informed Mr. Shepard that Lucid had no current availability to repair the Vehicle and that Lucid would contact him at an unknown later date to schedule the repairs.

25.     Lucid Center failed to provide an estimated repair timeline, when they would notify the Shepards of the scheduled repair, or any status update as to

Lucid's plans to correct the Vehicle's defects.

26.     Thereafter, the Lucid Service Center failed to contact the Shepards to address the Vehicle's defects that were present at the time of delivery, and Lucid otherwise failed to promptly respond to the Shepards' numerous inquiries.

27.     The Shepards attempted to contact multiple Lucid representatives about the Vehicle, but Lucid repeatedly failed to return the Shepards' calls and emails.

28.     Lucid failed to provide the necessary paperwork to the Shepards to enable them to register the Vehicle until December 29, 2022, over three months after the Shepards took delivery of the Vehicle and after the temporary tag expired, rendering the Vehicle undrivable.

29.     Lucid knew, or should have known, that any material delays in delivering the necessary paperwork would harm the Shepards. Despite this knowledge, Lucid took no action for over three months after delivery.

30.     On July 17, 2023, Mr. Shepard was driving the Vehicle on North Carolina Highway 64/74 East when the Vehicle spontaneously shut down. The loss of use while driving included a total loss of throttle control and electronic shutdown, creating a substantially dangerous condition for Mr. Shepard and other motorists traveling on North Carolina Highway 64/74 East.

31.     Mr. Shepard was able to safely navigate the Vehicle to a nearby parking lot without sustaining injury or causing injury to any other drivers.

32.     The total loss of power rendered the Vehicle unusable and

inaccessible.

33.     Mr. Shepard immediately contacted Lucid and coordinated with Lucid Roadside Assistance for the Vehicle to be towed to a Lucid Service Center in Virigina.

34.     In addition to addressing the complete power shutdown and malfunction in the Vehicle, Mr. Shepard requested Lucid repair the LCD screen, which was intermittently flashing and pixelating, and recalibrate the speedometer.

35.     On or around July 19, 2023, the Lucid Service Center contacted Mr. Shepard and admitted to him that Vehicle's rear end was damaged either during transit and/or upon delivery while in the care, custody, and control of Lucid, Lucid Roadside Assistance, and/or an agent authorized by Lucid.

36.     The damage to the Vehicle was significant and necessitated that the Vehicle be taken to a body shop to be repaired.

37.     Lucid acknowledged the damage and admitted to Mr. Shepard that the damages would be repaired by Lucid and at cost to Lucid. Lucid also admitted and acknowledged to Mr. Shepard that the paint protection film ("PPF") and ceramic coating, which had been applied after Mr. Shepard took delivery of the Vehicle and was subsequently damaged by Lucid, would be repaired by Lucid and at cost to Lucid.

38.     Consistent with Lucid's admission and acknowledgment of the damage it caused to the Vehicle, Lucid assured the Shepards that Lucid would immediately arrange a loaner vehicle for them during the pendency of the Vehicle's repair.

6

39.     As with prior assurances, Lucid failed to meet its obligations – delivering the loaner vehicle seven (7) days after the Vehicle malfunctioned and spontaneously shutdown.

40.     For almost three months, Lucid purportedly worked to repair the Vehicle – taking significant time to address issues that, upon information and belief, should have been repaired in considerably less time.

41.     Moreover, Lucid's pattern of non-communication left the Shepards without any knowledge of the timeline and status of the purported repairs to the Vehicle.

42.     On October 11, 2023, Lucid finally attempted to return the Vehicle to the Shepards.

43.     Despite Lucid's promise to repair the Vehicle, the Vehicle was in even worse condition and remained inoperable and unusable.

44.     Mr. Shepard immediately documented the extensive damages and promptly informed Lucid of the condition of the Vehicle, stating that he did not accept delivery due to the numerous issues.

45.     The considerable damages, defects, and issues with the Vehicle upon Lucid's delivery to the Shepards include, but are not limited to, the following:

    a.      Multiple Vehicle parts were missing, and the Vehicle was unsafe to operate;

    b.      The Vehicle made a loud thumping noise and vibration every fifteen yards when driven, even in a straight line, compromising the Vehicle's

7

drive shaft and/or steering column and overall driving capabilities;

   c. When the Vehicle was turned in either direction, it made a loud grinding and vibrating sound, again indicating significant issues with the drive shaft and/or steering column;

   d. The main LCD screen was inoperable;

   e. The interior leather was discolored on all seats and trim;

   f. The leather and plastic trim on the driver-side rear door was cut and scratched near the window;

   g. The drive door had a deep scratch;

   h. Water leaked through multiple doors, including the front passenger door and rear driver door;

   i. The rear window above the trunk was cracked;

   j. The trunk was improperly repaired and inoperable;

   k. The bumper light and camera were damaged;

   l. The frunk divider, all wheel caps, and all wheel covers were missing;

   m. All wheel rims were damaged, and the drums and rotors were significantly rusted;

   n. The charging port door was misaligned, severely impacting the Vehicle's charging capabilities;

   o. Wires protruded along the passenger side of the Vehicle; and

8

p.     The PPF and ceramic coating was not re-applied, as promised by Lucid.

46.     In addition to this new damage, the prior defects and damage to the Vehicle were not fixed during the three months when Lucid purported to being making those repairs.

47.     This remaining damage included, but was not limited to, the following:

a.     A prominent stain on the driver-side carpet;

b.     The LCD screen was inoperable and pixelated;

c.     The front driver quarter panel was scratched;

d.     The passenger-side rear window trim was scratched, and the seal was damaged; and

e.     The Vehicle remained inoperable and unsafe to drive due to electrical failures.

48.     Lucid failed to correct any of the defects that were present at the time of delivery and explicitly covered under the Warranty, despite making repeated promises and assurances to the Shepards that it would complete the repairs.

49.     Despite this significant damage, Lucid demanded that Mr. Shepard accept delivery of the Vehicle and relinquish possession of the loaner vehicle, despite the fact the Vehicle was inoperable.

50.     Lucid attempted to strongarm Mr. Shepard into signing an "Acceptance of Vehicle" form, which contained a release of liability for damage to the

9

Vehicle. Lucid approached Mr. Shepard about signing this "Acceptance of Vehicle" form even after he informed Lucid of the extensive damage to the Vehicle.

51.     Mr. Shepard refused to sign the "Acceptance of Vehicle" form.

52.     The Shepards requested that Lucid repair these defects covered by the Warranty and the additional damage sustained by the Vehicle while in Lucid's possession.

53.     The Shepards also requested to keep the loaner vehicle during these repairs.

54.     Lucid refused and insisted that the Shepards return the loaner vehicle.

55.     As a result of Lucid's actions, the Shepards had no usable vehicle.

56.     From October 12, 2023, through November 21, 2023, Mr. Shepard repeatedly sought updates from Lucid and demanded information on the defects and issues with the Vehicle.

57.     Once again, Lucid failed to prove any substantive updates, telling Mr. Shepard only that it was "in progress."

58.     From November 21, 2023, through March 13, 2024, the Shepards received no contact from Lucid or any of its representatives or affiliates.

59.     Consistent with its prior pattern of conduct, Lucid failed to return or acknowledge any of Mr. Shepard's repeated inquiries on the Vehicle.

60.     Ultimately, Lucid directed Mr. Shepard to contact Lucid Roadside Mobility Program Manager, Lisa Zeitz.

61.     Ms. Zeitz then informed Mr. Shepard that yet another Lucid employee, Jake Rodenroth, would actually provide him with substantive information on the extensive damage to the Vehicle and the status of any repairs.

62.     When Mr. Shepard spoke with Mr. Rodenroth, despite Lucid having actual knowledge of the Vehicle's defects and subsequent damage, Mr. Rodenroth inquired about the specific items at issue, seemingly unaware of the extensive detail and documentation Mr. Shepard had previously provided to Lucid.

63.     In response, Mr. Shepard once again described every issue with the Vehicle.

64.     In a March 22, 2024 e-mail to Mr. Shepard, Mr. Rodenroth stated that, "If you [Mr. Shepard] still want to pursue the buyback path, I will turn you over to the team at customer care."

65.     Ms. Zeitz then emailed Mr. Shepard and stated, "If you would like to begin the process of returning your vehicle, I will go ahead and forward this email thread to our Customer Care team. A case will be created and reviewed by our Mediation Team."

66.     In response to this correspondence, Mr. Shepard informed Ms. Zeitz and Mr. Rodenroth that he would like to return the Vehicle, or have the Vehicle replaced. True and accurate copied of the emails between Mr. Shepard, Ms. Zeitz, and Mr. Rodenroth are attached hereto and incorporated herein by reference as **Exhibit C**.

67.     Despite making repeated promises to repair the Vehicle, and

despite having the Vehicle in its possession for several months, Lucid has failed to perform any repairs to address the defects explicitly covered by the Warranty and/or to repair the damage to the Vehicle due to Lucid's actions and while the Vehicle was in Lucid's care, custody, and control.

68. While in their possession, the Shepards properly operated and maintained the Vehicle, in accordance with all requirements in the owner's manual and all other documentation supplied by Lucid.

69. Despite Lucid's representations that the Shepards could pursue the buyback path to return the Vehicle to Lucid, Lucid refused to allow the return and otherwise refused to refund the Vehicle's purchase price.

**FIRST CLAIM FOR RELIEF**
(Cancellation Under Magnuson-Moss Act – 15 U.S.C. § § 2301-2312)

70. The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

71. This is an action against Lucid brought pursuant to Section 2310 of the Magnuson-Moss Warranty Act, 15 U.S.C. § § 2301-2312 ("Magnus-Moss Act") for the actual damages and to cancel the contract for Lucid's breach of express warranty.

72. The Vehicle is a consumer product as defined in Section 2310(1).

73. The Shepards are consumers as defined in Section 2310(3).

74. Lucid is a warrantor as defined in Section 2310(5).

75. The Warranty is a written warranty as defined in Section

12

2310(6)(A) and Section 2310(6)(B).

76. Lucid has no dispute resolution mechanism which meets the requirements of 16 C.F.R., Part 703, promulgated by the Federal Trade Commission (FTC) pursuant to § 2310(a)(2) of the Magnuson-Moss Act.

77. As described above, the Shepards afforded Lucid multiple opportunities to cure its failure to comply and comport its actions with its Warranty.

78. Despite these multiple opportunities and having possession of the Vehicle for months, Lucid failed to comply with the Warranty or otherwise repair, replace, and/or adjust the parts of the Vehicle that malfunctioned, were damaged, or otherwise failed to operate in the manner necessary for the Vehicle to safely operate.

79. The Shepards are entitled to actual and punitive damages against Lucid for its breach of Warranty.

## SECOND CLAIM FOR RELIEF
*(Breach of Contract – N.C. Gen. Stat. § 25-2-714)*

80. The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

81. The Agreement is a valid and enforceable contract supported by consideration.

82. The Shepards timely tendered the purchase price for the Vehicle as identified in the Agreement to Lucid.

83. The Shepards have otherwise fully complied with all terms and conditions of the Agreement.

13

84. Lucid has breached its obligations and failed to satisfy the terms and conditions of the Agreement in at least the following ways:

      a.      Delivering the Vehicle in damaged, defective condition;

      b.      Failing to make repairs to the Vehicle that were expressly covered by the Warranty;

      c.      Failing to provide the repair service as described in Paragraph 5 of the Agreement at no charge to the Shepards; and

      d.      In other ways that may be demonstrated at trial.

85. There is no excuse for Lucid's breaches of the Agreement, which are material and substantial breaches of the Agreement.

86. The Shepards notified Lucid of its breach within a reasonable time pursuant to N.C. Gen. Stat. § 25-2-607(3)(a).

87. As a direct and proximate result of Lucid's acts and omissions in breaching the Agreement, the Shepards have suffered, and continue to suffer, damages, costs, and other losses.

88. Lucid's breach of the Agreement has also caused reasonably foreseeable consequential harm to the Shepards, to include without limitation, attorneys' fees and expenses in the prosecution of this action.

89. As a direct and proximate result of Lucid's acts and omissions, the Shepards have been damaged in an amount greater than $75,000.00, the precise amount of which will be proven at the trial of this matter, plus interest at the maximum legal rate until fully satisfied and paid in full from the date(s) of the

14

breach(es).

**THIRD CLAIM FOR RELIEF**

(*Breach of Express Warranties – N.C. Gen. Stat. § 25-2-313*)

90.     The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

91.     Pursuant to the New Vehicle Limited Warranty, Lucid warranted that it would, without charge, repair, replace, or adjust all parts on the Vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship provided the Vehicle was properly operated and maintained in accordance with all requirements in the owner's manual and was taken to a Lucid Service Center for a warranted repair during the warranty period.

92.     The Vehicle contained multiple manufacturing defects in factory-supplied materials or factory workmanship at the time of delivery, including noticeable paint chips, stained carpet, and damaged trim. These defects are explicitly covered under the Warranty.

93.     The Vehicle's LCD screen malfunctioned or otherwise failed during the applicable coverage period due to a manufacturing defect or factory-supplied materials or workmanship.

94.     The Vehicle spontaneously shut down while in operation. Upon information and belief, that spontaneous shutdown occurred as a result of a manufacturing defect or factory-supplied workmanship.

15

95. During all relevant times, the Shepards properly operated and maintained the Vehicle in accordance with all requirements in the owner's manual.

96. The Shepards sent the Vehicle to a Lucid Service Center for the warranted repair during the warranty period.

97. Despite having possession of the Vehicle for nearly three months, Lucid failed to repair, replace, or adjust the parts that malfunctioned on the Vehicle during the Warranty period.

98. The Vehicle's defects render the Vehicle unsafe to operate, and therefore worthless to the Shepards.

99. As a direct and proximate result of Lucid's breach of its Warranty, the Shepards have been damaged in an amount in excess of $75,000.00.

100. The Shepards are entitled to judgment against Lucid for breach of its Warranty in an amount in excess of $75,000.00, plus interest, costs, and attorneys' fees as allowed by law.

## FOURTH CLAIM FOR RELIEF
*(Trespass to Chattels – N.C. Gen. Stat. § 99A-1)*

101. The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

102. On or around July 18, 2023, Mr. Shepard permitted Lucid Service Center to take possession of the Vehicle, following the Vehicle's spontaneous malfunction and system shutdown during operation.

103. Lucid accepted possession of the Vehicle and promised Mr.

16

Shepard that Lucid would repair the defects to the Vehicle.

104. While in Lucid's care, custody, and control, the Vehicle was significantly damaged – either in transit or upon delivery to the Lucid Service Center.

105. Despite possessing the Vehicle for several months, Lucid failed to correct the damage caused to the Vehicle.

106. The damage sustained by the Vehicle while in Lucid's care, custody, and control constitutes a trespass for which damages may be recovered.

107. The Shepards are entitled to all damages directly and proximately caused by Lucid, Lucid Roadside Assistance, and/or the authorized agent's trespass upon the Vehicle, including actual damages to the Vehicle and damages resulting from the Shepards' inability to use the Vehicle as a result of the damages.

108. Lucid's actions and conduct were in conscious and intentional disregard of and indifference to the rights of the Shepards, and Lucid knew or should have known that such acts and conduct were reasonably likely to result in injury, damage, and harm to the Shepards. As such, the Shepards are entitled to punitive damages, pursuant to Chapter 1D of the North Carolina General Statutes.

**FIFTH CLAIM FOR RELIEF**
(*Negligence*)

109. The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

110. Lucid owed a duty to the Shepards to exercise reasonable care in

17

in its handling of the Vehicle while the Vehicle was in the control of Lucid, Lucid Roadside Assistance, and/or an agent of Lucid Roadside Assistance authorized to transport the Vehicle to Lucid Service Center.

111.    Lucid acted negligently, and violated its duty to the Shepards, in connection with its handling of the Vehicle.

112.    As a direct and proximate result of Lucid's mishandling of and improper repairs to the Vehicle, the Vehicle was further damaged.

113.    The Shepards are entitled to have and recover monetary damages from Lucid an amount which fully and completely compensates them for the damage to the Vehicle.

114.    In the event that this Court determines that the Shepards are entitled to recover an amount less than $75,000.00, then the Shepards are entitled to have and recover of Lucid their attorneys' fees pursuant to N.C. Gen. Stat. § 6-21.1.

## SIXTH CLAIM FOR RELIEF
*(Damage in Bailment – N.C. Gen. Stat. § 99A-1)*

115.    The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth.

116.    In July 2023, Mr. Shepard relinquished possession of the Vehicle to Lucid and/or Lucid Roadside Assistance after the Vehicle spontaneously shutdown while in operation.

117.    Lucid, Lucid Roadside Assistance, and/or an authorized agent of Lucid authorized to transport the Vehicle to Lucid Service Center accepted possession

18

of the Vehicle and transported the Vehicle to Lucid Service Center.

118.    During the time that the Vehicle was in the sole possession and custody of Lucid, Lucid Roadside Assistance, and/or an authorized agent of Lucid Roadside Assistance transporting the Vehicle to Lucid Service Center, the negligent actions of Lucid, Lucid Roadside Assistance, and/or an authorized agent of Lucid's negligence caused damage to the Vehicle.

119.    As a result, the Shepards have been damaged in excess of $75,000.00.

120.    The Shepards are entitled to have and recover monetary damages from Lucid in an amount which fully and completely compensates them for the damage to the Vehicle.

121.    In the event that this Court determines that the Shepards are entitled to recover in an amount less than $75,000.00, then the Shepards are entitled to have and recover of Lucid their attorneys' fees pursuant to N.C. Gen. Stat. § 6-21.1.

## SEVENTH CLAIM FOR RELIEF
### (*Negligent Misrepresentation*)

122.    The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

123.    Lucid made repeated representations to the Shepards that Lucid would repair the Vehicle.

124.    Upon discovery of numerous defects at the time of the Vehicle's delivery, Lucid assured the Shepards that the Vehicle would be repaired by Lucid

19

and at cost to Lucid.

125.     In July 2023, Lucid again represented to the Shepards that the Vehicle would be repaired following its spontaneous electronic shutdown.

126.     Lucid represented to the Shepards that the Vehicle would be repaired after it was damaged while in the care and control of Lucid, Lucid Roadside Assistance, and/or an agent authorized by Lucid to transport the Vehicle to Lucid Roadside Assistance.

127.     Lucid failed to correct any of the defects that were present at the time of delivery.

128.     Lucid failed to correct the damage that was caused to the Vehicle while it was in the care and control of Lucid, Lucid Roadside Assistance, and/or an authorized agent of Lucid to transport the Vehicle to Lucid Roadside Assistance.

129.     Lucid further represented to the Shepards, through Lucid employees Lisa Zeitz and Jake Rodenroth, that Lucid would buy back the Vehicle.

130.     Despite Lucid's repeated representations that it would repair the Vehicle's defects at the time of delivery and damage sustained while in Lucid's care, Lucid never adequately repaired the Vehicle.

131.     Despite Lucid's representations that the Shepards could pursue the buyback program and return the Vehicle, Lucid refused the Shepards' attempts to avail itself of this program.

132.     Lucid's representations included false information and false statements regarding Lucid's willingness to repair the Vehicle or buy the Vehicle

20

back from the Shepards.

133.    Lucid failed to exercise reasonable care or competence in communicating this false information to the Shepards.

134.    The Shepards reasonably relied upon Lucid's misrepresentations and were in fact deceived by Lucid's representations in that they allowed Lucid to have possession of the Vehicle for several months in order to fix the Vehicle and thereafter forced to drive their diesel camper because Lucid rendered the Vehicle unsafe and inoperable.

135.    Lucid's negligent misrepresentations directly and proximately caused the Shepards to suffer damages in excess of $75,000.00.

136.    The Shepards are entitled to all damages directly and proximately caused by Lucid's negligent misrepresentations. Further, due to Lucid's willful and wanton actions, the Shepards are entitled to punitive damages, pursuant to Chapter 1D of the North Carolina General Statues.

**EIGHTH CLAIM FOR RELIEF**
(*Breach of Implied Covenant of Good Faith and Fair Dealing*)

137.    The Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

138.    Lucid and the Shepards entered into the Agreement for the purchase of the Vehicle.

139.    The Shepards performed their obligations under the Agreement by tendering the full purchase price for the Vehicle.

21

140. Lucid's actions, in repeatedly promising to repair the Vehicle and failing to repair the Vehicle, unfairly and unreasonably prevented the Shepards from receiving the benefits to which they were entitled under the Agreement.

141. As a direct and proximate result of Lucid's breach of the implied covenant of good faith and fair dealing, the Shepards have been damaged in an amount in excess of $75,000.00.

142. The Shepards are entitled to judgment against Lucid, jointly and severally, in an amount in excess of $75,000.00.

## NINTH CLAIM FOR RELIEF
*(Unfair and Deceptive Trade Practices – N.C. Gen. Stat. § 75-1.1)*

143. Shepards restate and incorporate by reference their statements and allegations contained in all other paragraphs in this action as if fully set forth herein.

144. At all relevant times, Lucid has been engaged in the business of designing, manufacturing, selling, and warrantying electric vehicles in the State of North Carolina. Its business of selling and warrantying electric vehicles to citizens of North Carolina, and all conduct complained of, was in or affecting commerce as defined by N.C. Gen. Stat. § 75-1.

145. In the course of conducting its business, Lucid committed unfair and deceptive trade practices and unconscionable business conduct, all in violation of the common law and Chapter 75 of the North Carolina General Statutes, in at least the following ways, and in other ways to be shown at a trial in this matter:

a. Misrepresenting pertinent facts relating to Lucid's

22

willingness to repair the defects that there present at the time of the Vehicle's delivery to the Shepards;

b.      Wrongfully inducing the Shepards to accept delivery of the Vehicle by assuring the Shepards that Lucid would take all steps necessary to repair the Vehicle's defects when Lucid in fact had no intention to repair the Vehicle;

c.      Failing to acknowledge and act reasonably promptly upon the Shepards' repeated requests and follow-up communications regarding repairs to the Vehicle's defects;

d.      Wrongfully withholding documentation necessary for the Shepards to register the Vehicle, thereby preventing the Shepards from legally operating the Vehicle for months after the Vehicle's delivery;

e.      Refusing to repair the defects that were expressly covered by the Warranty;

f.      Failing to adopt and implement reasonable standards for the prompt investigation of reported defects covered by Lucid warranties, specifically including the defects to the Vehicle that were covered by the Warranty;

g.      Allowing the Vehicle to be further damaged while in Lucid's care and control following the Vehicle's electronic shutdown;

h.      Keeping the Shepards' Vehicle for nearly three months after it was damaged while in Lucid's care and control;

i.      Failing to repair the extensive damage the Vehicle sustained while in Lucid's care and control despite making repeated representations

23

to the Shepards that the Vehicle would be repaired;

       j.     Failing to repair the electrical damages that made the Vehicle unsafe and inoperable;

       k.     Forcing the Shepards to relinquish possession of the loaner vehicle despite Lucid's failure to adequately repair the damage done to the Vehicle;

       l.     Attempting to coerce the Shepards into signing an Acceptance of Vehicle form that contained a release of liability for Lucid's wrongful conduct; and

       m.     Compelling the Shepards to institute litigation by refusing to comply with the Warranty and offering substantially less than the amounts necessary to repair the Vehicle's defects and damage done to the Vehicle while in Lucid's care and control.

146.    Lucid's wrongful and unlawful activities described above are unfair and deceptive trade acts or practices and unconscionable business conduct, all in violation of the common law and Chapter 75 of the North Carolina General Statues.

147.    These actions were and are "in or affecting commerce," as defined by N.C. Gen. Stat. § 75-1.1.

148.    As a direct and proximate result of Lucid's unethical, unfair, and deceptive trade practices, the Shepards have been damaged in a sum in excess of $75,000.00, the precise amount of which will be proven at trial of this matter, plus interest at the maximum legal rate until fully satisfied and paid in full from the date(s) of violation(s).

24

149. Pursuant to N.C. Gen. Stat. § 75-16, the Shepards are entitled to have the aforementioned damages trebled and to recover their reasonable attorneys' fees.

WHEREFORE, the Shepards pray unto this Court as follows:

1. That they have and recover a money judgment against Lucid in an amount in excess of $75,000.00;

2. That they have and recover of Lucid interest, costs, punitive damages, and attorneys' fees as permitted by N.C. Gen. State § 75-16.1;

3. That their damages be trebled in accordance with N.C. Gen. Stat. § 75-16;

4. For a trial by jury on all issues so triable; and

5. For such other and further relief as to this Court may seem just and proper.

Respectfully submitted this the 23rd day of May 2025.

*/s/ Clinton H. Cogburn*
Clinton H. Cogburn
N.C. State Bar I.D. No.: 50628
email: docket@wardandsmith.com *
email: chcogburn@wardandsmith.com **
For the firm of Ward and Smith, P.A.
Post Office Box 2020
Asheville, NC 28802-2020
Telephone: 828.348.6070
Facsimile: 828.348.6077
*Attorneys for Plaintiffs*

*This email address must be used in order to effectuate service under the Federal Rules of Civil Procedure.
** Email address to be used for all communications other than service.

25

VERIFICATION

STATE OF NORTH CAROLINA
COUNTY OF CHEROKEE

   MICHAEL P. SHEPARD, being duly sworn, deposes and says that he has read the foregoing COMPLAINT, and the same is true of his own knowledge, except as to those matters and things stated on information and belief, and, as to those, he believes them to be true.

_____
Michael P. Shepard

*Cherokee* COUNTY, NORTH CAROLINA

Sworn to (or affirmed) and subscribed before me this day by *Michael Shepard*
         *(type/print name of signer)*

Date *5-21-2025*    *Barbara Pickens*
  *Signature of Notary Public*
  *(Official Seal)*
  My commission expires: *8-19-2028*

BARBARA PICKENS
NOTARY
PUBLIC
CHEROKEE COUNTY, NC

ND:4915-5136-1052, v. 1