**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:25-cv-00149-MR-WCM**

| | | |
|---|---|---|
| **MICHAEL P. SHEPARD and MELISSA J. SHEPARD,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **<u>MEMORANDUM OF DECISION AND ORDER</u>** |
| **LUCID GROUP USA, INC.,** | ) | |
| **Defendant.** | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 40] and the Plaintiffs' Motion for Partial Summary Judgment [Doc. 42].

## I. PROCEDURAL BACKGROUND

This action arises out of a contract dispute regarding the Plaintiffs' purchase of a 2022 Lucid Air Grand Touring vehicle in September 2022. On May 23, 2025, the Plaintiffs Michael and Melissa Shepard filed a Complaint against the Defendant Lucid Group USA, Inc. [Doc. 1]. On April 1, 2026, the Defendant filed a Motion for Judgment on the Pleadings. [Doc. 24]. On May 20, 2026, the Court granted in part the Defendant's Motion and dismissed the Plaintiffs' claims for trespass to chattels, negligent misrepresentation,

and breach of implied covenant of good faith and fair dealing. [Doc. 38 at 17-18]. Six claims remain: (1) cancellation under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, et seq., (2) breach of contract, (3) breach of express warranties, (4) negligence, (5) damage in bailment, and (6) unfair and deceptive trade practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 ("Chapter 75 claim").

On June 23, 2026, the parties filed the present motions. The Defendant moves for summary judgment on all of the Plaintiffs' remaining claims. [Doc. 40]. The Plaintiffs move for partial summary judgment on their claims for breach of contract, breach of express warranties, negligence, and damage in bailment. [Doc. 42]. The Plaintiffs and the Defendant filed their respective responses in opposition on July 7, 2026. [Docs. 44, 45]. On July 14, 2026, the Plaintiffs and the Defendant filed their respective replies. [Docs. 46, 48]. Having been fully briefed, this matter is now ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As the Supreme Court has

observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). When ruling on a motion for summary judgment, the Court does not "weigh the evidence or make credibility determinations." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (quoting Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568-69 (4th Cir. 2015)). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party, who must convince the Court that a triable issue does exist. Id.

In considering the motion for summary judgment, the Court must view the pleadings and materials presented "in the light most favorable" to the nonmovant and must "draw all reasonable inferences" in the nonmovant's favor. Adams v. Trustees of Univ. of N.C.—Wilmington, 640 F.3d 550, 556 (4th Cir. 2011). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56[.]" Koppers Performance Chems., Inc. v. Argonaut-Midwest Ins. Co., 105 F.4th 635, 640 (4th Cir. 2024) (quoting Desmond v. PNGI Charles Town Gaming, LLC, 630 F.3d 351, 354 (4th Cir. 2011)).

## III. FACTUAL BACKGROUND

The following forecast of evidence is presented in the light most favorable to the Plaintiffs.[1]

The Defendant is a designer, seller, and retailer of luxury electric vehicles. [Doc. 1: Complaint at ¶ 7; Doc. 10: Answer at ¶ 7]. On September 14, 2022, the Plaintiffs signed a Purchase Agreement (the "Agreement") to purchase a new 2022 Lucid Air Grand Touring vehicle (the "Vehicle") from the Defendant for $145,198.60. [Doc. 42-1: Purchase Agreement ("Agmt")

[1] Because the Defendant moves for summary judgment on all of the Plaintiffs' remaining claims, the Court will first view the forecast of evidence in the light most favorable to the Plaintiffs.

at 3, 7]. The Agreement included a one-year limitations period to bring any claim arising out of the Agreement:

> You also agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to these Terms must be filed within one (1) year after such claim or cause of action arose or be forever barred.

[Doc. 42-1: Purchase Agmt. at 6 ¶ 11].

The Vehicle also came with a New Vehicle Limited Warranty, which provided, in pertinent part, as follows:

> Under this Lucid New Vehicle Limited Warranty, Lucid will, without charge and as determined by Lucid at its discretion, repair, replace, or adjust all parts on your new vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship provided your vehicle has been properly operated and maintained in accordance with all requirements in the owner's manual and any other documentation we may provide you, and was taken to a Lucid Service Center for a warranted repair during the warranty period.

[Doc. 1-3: New Vehicle Limited Warranty at 4].

The Defendant delivered the Vehicle to the Plaintiffs on September 28, 2022. [Doc. 1: Complaint at ¶10; Doc. 10: Answer at ¶ 10]. Upon delivery, the Vehicle had a paint chip in the hood and window trim damage. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 51; Doc. 42-6: Melissa Shepard Dep. at 25]. One of the Defendant's employees documented the damage in a written

document called a due bill. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 63]. The Plaintiffs also photographed the damage. [Doc. 42-6: Melissa Shepard Dep. at 28-29]. Shortly after delivery, the Plaintiffs emailed the Defendant's customer care team about the paint chip and window trim damage observed at delivery, as well as pixelation of the LCD panel. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 64-65]. Between September 29, 2022 and October 17, 2022, the parties communicated by email in an attempt to schedule an appointment to repair the damage. [Doc. 40-9: Plf.'s Answer to Def.'s Interrog. at 9]. This appointment, however, was never scheduled, and the Defendant did not repair the issues identified at delivery. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 67].

In July 2023, the Vehicle shut down while Mr. Shepard was driving in North Carolina. [Doc. 40-14: Vehicle Serv. Hist. at 2; Doc. 42-5: Michael Shepard Dep. at 80-81]. Mr. Shepard contacted the Defendant's Roadside Assistance, and a third-party towing company towed the Vehicle to the Defendant's Richmond, Virginia service center. [Doc. 40-14: Vehicle Serv. Hist. at 2; Doc. 42-5: Michael Shepard Dep. at 82]. The Vehicle's rear bumper was damaged during transit. [Doc. 40-14: Vehicle Serv. Hist. at 2].

On July 19, 2023, the Vehicle arrived at the Defendant's Richmond service center. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 73]. The Defendant

performed diagnostic testing on the Vehicle and determined that the Vehicle shut down due to a high voltage failure. [Id. at 77]. The Defendant then replaced the rear drive unit ("RDU") and front drive unit ("FDU"), performed battery back repair, checked for leaks, and updated all software requirements. [Doc. 40-14: Vehicle Serv. Hist. at 3]. The Defendant also had a local auto body shop repair the damaged bumper at no cost to the Plaintiffs. [Doc. 40-12: Bill at 2-3]. The Defendant's repair team noted that the "vehicle worked ok" after the repairs were completed. [Doc. 40-14: Vehicle Serv. Hist. at 3]. The Defendant returned the Vehicle to the Plaintiffs on October 11, 2023. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 91].

The Plaintiffs noticed several new issues with the Vehicle upon its return. [Doc. 42-5: Michael Shepard Dep. at 117]. Specifically, the Vehicle made new noises when the Plaintiffs tried to drive it, leading the Plaintiffs to question whether the Defendant had actually fixed the problems that caused the Vehicle's July shut down. [Id. at 117 (noting that it felt like "driving on two flat tires")]. The Plaintiffs also noted new damage to the Vehicle, including a missing frunk divider, missing aero covers, rusting on the rotor, discoloration of the interior seats, scratches on the driver side door, scratches near the passenger side window, water leakage through multiple doors, damage to the bumper light and back camera, and misalignment of the charging port.

[Id. at 110-113; Doc. 42-3: Def.'s 30(b)(6) Dep. at 104-105]. Based on the driving noises, new damage, and the Plaintiffs' distrust that the Defendant fixed the defects in the Vehicle, the Plaintiffs concluded that the car was not safe to drive on the road. [Doc. 42-5: Michael Shepard Dep. at 117-118].

After the Vehicle was returned, the Defendant requested the Plaintiffs sign a service invoice form detailing the repairs made to the Vehicle. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 110]. The Plaintiffs refused to sign the invoice in light of the new damage and failed repairs. [See id. at 112; Doc. 42-5: Michael Shepard Dep. at 115].

On October 11, 2023, the Plaintiffs sent pictures of the new damage via text message to Russell Morris, one of the Defendant's Richmond service center employees. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 94, 103]. On November 21, 2023, the Plaintiffs texted Mr. Morris again to complain about the lack of repair, stating that "[i]f [the Vehicle] is not replaced or damages fixed before end of year, [we'll] be in process of filing suit." [Doc. 42-3: Def.'s 30(b)(6) Dep. at 113]. The Defendant did not respond to the Plaintiffs' concerns about the condition of the Vehicle. [Doc. 42-5: Michael Shepard Dep. at 121-122]. On March 14, 2024, the Plaintiffs again texted Mr. Morris to complain about the delay in fixing the damage to the Vehicle. [Doc. 42-3: Def.'s 30(b)(6) Dep. at 113-114]. In response to this message, Mr. Morris

provided the Plaintiffs with an email address for a different Lucid employee. [Id.] Other than these text messages, there was no further communication from the Plaintiffs about repairing the Vehicle.[2] [Doc. 42-5: Michael Shepard Dep. at 120-121].

On March 14, 2024, the Plaintiffs emailed Lisa Zeitz, a Lucid Roadside Mobility Program Manager, to summarize the Plaintiffs' dissatisfaction with the Vehicle's repair and the Defendant's lack of communication. [Doc. 40-2: Mar. 14, 2024 Emails at 2-4]. In a separate email later that day, the Plaintiffs also stated that "[we] fully intend to file legal suit should [the Defendant] not agree to purchase the vehicle back at a reasonable above value cost or replace the vehicle altogether with one without aftermarket parts or damages." [Id. at 4]. Ms. Zeitz responded that she "will make sure the appropriate individuals are made aware of [the Plaintiffs'] concerns and intentions" and "we will work to make this right for you." [Id. at 3, 5]. She then referred the Plaintiffs' concerns to Jake Rodenroth, a Lucid Body Repair Program Operations Manager. [Id. at 5; Doc. 40-3: Mar. 21, 2024 Email at 2].

[2] While Lucid did not respond directly to the Plaintiffs' complaints about the lack of repairs, it did contact the Plaintiffs about signing the final invoice. [Doc. 42-3: Def's 30(b)(6) Dep. at 114:19-20]. The Plaintiffs refused to sign this document on three separate occasions. [Id.]. Although the Defendant claims that this document had to be signed before additional work could be ordered for the Vehicle, no one communicated this to the Plaintiffs. [Id. at 114, 116-117].

On March 21, 2024, Mr. Rodenroth emailed the Plaintiffs to discuss the Plaintiffs' complaints regarding the repairs performed on the Vehicle. [Doc. 40-3: Mar. 21-22, 2024 Emails at 2]. In their response, the Plaintiffs repeated their demand for a buy-back at above market value or a full replacement. [Id. at 3]. The Plaintiffs were then referred to the Defendant's Customer Care and Mediation Teams. [Id. at 7].

Between April 2, 2024 and May 15, 2024, the Plaintiffs communicated with Bill Bragger, the Defendant's Head of Customer Care, to negotiate a resolution to the Plaintiffs' demands. [See Doc. 40-4: April 2-12, 2024 Emails; Doc. 40-5: April 15-18, 2024 Emails; Doc. 40-7: April 23-May 6, 2024 Emails; Doc. 40-8: May 13-15, 2024 Emails]. Mr. Bragger stated that the Defendant could not commit to replacing or buying back the Vehicle, but that he would nevertheless "advocate for a fair and equitable resolution." [Doc. 40-4: April 2-12, 2024 Emails at 3]. The Plaintiffs responded by acknowledging the Defendant's refusal to comply with their demands and by stating that the Defendant was "welcome to send the best proposal Lucid is willing to offer, but most likely this will not avoid litigation." [Id. at 4].

The Defendant, through Mr. Bragger, then sent the Plaintiffs two offers. On April 18, 2024, the Defendant offered to completely restore the Vehicle to all factory specifications, perform all diagnostic tests, install the latest

software, and pay the Plaintiffs $7,500. [Doc. 40-5: April 15-18, 2024 Emails at 5]. The Plaintiffs rejected this offer on April 21, 2024. [Doc. 40-7: April 23-May 6, 2024 Emails at 2]. On May 13, 2024, the Defendant offered to completely restore the Vehicle, provide a loaner car during the repairs, and give the Plaintiffs a $10,000 cash settlement. [Doc. 40-8: May 13-15, 2024 Emails at 2]. On May 14, 2024, the Plaintiffs acknowledged, but did not accept, this offer. [Id. at 3].

The last email communication between the parties occurred on May 15, 2024. [Id. at 4]. In his last email, Mr. Bragger stated that he was "hopeful that we can open a dialog [sic] that will move us forward with the restoration of your vehicle." [Id.]. The Plaintiffs did not respond to this email, and all later communication was through the parties' attorneys. [Doc. 40-6: Michael Shepard Dep. at 157].

The Plaintiffs filed the present action on May 23, 2025. [Doc. 1].

## IV. DISCUSSION

### A. Statute of Limitations

North Carolina law permits parties to agree through contract to a shorter statute of limitations, so long as the limitation is not prohibited by statute and is reasonable. Warren v. Cielo Ventures, Inc., 389 N.C. 151, 155, 926 S.E.2d 716, 719 (2026). Under the North Carolina Uniform Commercial

Code, parties to a contract "may reduce the period of limitation to not less than one year but may not extend it." N.C. Gen. Stat. § 25-2-725(a).

Here, the parties' Purchase Agreement explicitly reduced the statute of limitations for all claims "arising from or relating to" the Agreement to one year after such claim accrued. [Doc. 42-1: Purchase Agmt. at ¶ 11]. The Plaintiffs filed this action on May 23, 2025. [Doc. 1]. As such, any contractual claims that accrued prior to May 23, 2024 are subject to dismissal as untimely under the terms of the Purchase Agreement.

The Plaintiffs' breach of contract claim is premised on the theory that the Defendant breached the Purchase Agreement by delivering a defective vehicle. [See Doc. 45 at 11 ("Delivering a defective vehicle when the contract calls for delivery of the vehicle as configured is a breach of the sales contract."). A breach of contract claim accrues at "the time the first injury was sustained." Pearce v. N.C. State Hwy. Patrol Voluntary Pledge Committee, 310 N.C. 445, 449, 312 S.E.2d 421, 424 (1984) (quoting Matthieu v. Gas Co., 269 N.C. 212, 215, 152 S.E.2d 336, 339 (1967)). Thus, the Plaintiffs' breach of contract claim accrued on the date of delivery of the defective vehicle, September 28, 2022.

The Plaintiffs contend that their breach of contract claim never truly accrued because the Defendant had not issued a "final and unequivocal

refusal" of the Plaintiffs' demands to replace or buyback the Vehicle. [Doc. 45 at 1, 5]. The fact that the parties were continuing to negotiate a potential resolution of their contract dispute, however, does not affect when the Plaintiffs' breach of contract claim *accrued*.

The Plaintiffs' warranty and MMWA claims fare no better. The MMWA borrows the applicable limitations period under North Carolina law, which permits parties to contractually reduce the limitations period to one year. See N.C. Gen. Stat. § 25-2-725; Wheeler v. BMW of N. Am. LLC, 534 F. Supp. 3d 527, 534-35 (W.D.N.C. 2021) (noting that MMWA borrows North Carolina statute of limitations for breach of warranty claims). "A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered." N.C. Gen. Stat. § 25-2-725(b). While the Plaintiffs have presented a forecast of evidence that they experienced a number of issues with the Vehicle over a period of several months, the undisputed forecast of evidence shows that all of these warranty claims clearly arose and were known to the Plaintiffs prior to May 23, 2024. As such, the Plaintiffs' warranty and MMWA claims are also time-barred.

The Plaintiffs' Chapter 75 claim is based on the same conduct underlying their claims for breach of contract, and breach of warranty, and cancellation under the MMWA. A mere breach of a contract or breach of warranty—even if intentional—is insufficient to state a Chapter 75 claim. Mitchell v. Linville, 148 N.C. App. 71, 74, 557 S.E.2d 620, 623 (2001); Branch Banking and Trust Co. v. Thompson, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992). In any event, the Plaintiffs' Chapter 75 claim is also untimely. While Chapter 75 claims are normally governed by a four-year statute of limitations, N.C. Gen. Stat. § 75-16.2, the parties to a contract may also shorten this limitations period by agreement. See Warren, 389 N.C. at 155, 926 S.E.2d at 719. Like the Plaintiffs' contract and warranty claims, any claim the Plaintiffs had arising under Chapter 75 clearly accrued prior to May 23, 2024. Accordingly, the Plaintiffs' Chapter 75 claim is also time-barred.

Alternatively, the Plaintiffs argue that the doctrine of equitable tolling should bar the Defendant from relying upon any statute of limitations defense. "Under the doctrine of equitable tolling, a party is barred from asserting a technical defense, such as a statute of limitations, 'when delay has been induced by acts, representations, or conduct, the repudiation of which would amount to a breach of good faith.'" Petty v. Marvin Lumber & Cedar Co., 644 F. App'x 272, 273 (4th Cir. 2016) (quoting Nowell v. Great Atl.

& Pac. Tea Co., 250 N.C. 575, 108 S.E.2d 889, 891 (1959)). "However, a plaintiff who seeks to obtain equitable tolling of a limitations period must show that he reasonably relied upon a representation made by the Defendant." Petty, 644 F. App'x at 273 (citing Town of Pineville v. Atkinson/Dyer/Watson Architects, P.A., 114 N.C. App. 497, 442 S.E.2d 73, 74-75 (1994)).

In relying upon equitable tolling, the Plaintiffs cite evidence of the parties' extensive negotiations to attempt to resolve their existing claim. These negotiations, however, are irrelevant to the issue of when their claim accrued. When a breach occurs, the claim accrues and the statute of limitations begins to run. In order to assert equitable tolling of that statute of limitations, the Plaintiffs must present some forecast of a representation—i.e., an assertion of a pre-existing fact—on which the Plaintiffs reasonably relied in order to defer filing their suit. The Plaintiffs, however, have failed to present any forecast of evidence that such a representation was made. Once the Vehicle was returned to the Plaintiffs on October 11, 2023, the Plaintiffs expressed their dissatisfaction with the Vehicle and the attempts at repair. What ensued from there was only an attempt to negotiate a resolution to the Plaintiffs' claims. But negotiations are not representations. They do not serve to extend the limitations period (indefinitely) or to form a basis for

equitable tolling. Even if they did, however, no such negotiations or exchanges took place after May 15, 2024, and any tolling that may have been provided thereby ceased. The Plaintiffs, however, did not file within one year of that date. Thus, even if equitable tolling were to apply in this case (it does not), the Plaintiffs' claims are still time barred. Accordingly, the Court concludes that the Defendant is entitled to summary judgment with respect to the Plaintiffs' claims for breach of contract, breach of warranty, and cancellation under the MMWA.

**B. Economic Loss Rule**

The economic loss rule generally bars tort claims "for [a defendant's] simple failure to perform his contract, even though such failure was due to negligence or lack of skill." Cresent Univ. City Venture, LLC v. Trussway Mfg., Inc., 376 N.C. 54, 58, 852 S.E.2d 98, 101 (2020) (citing N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 83, 240 S.E.2d 345, 351 (1978)). To avoid the economic loss rule, a plaintiff's tort claim must be based on an extra-contractual duty that is separate and distinct from the contract. Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 165-66 (4th Cir. 2018); Wheeler, 534 F.Supp.3d at 533.

The Plaintiffs' claims for negligence and damage in bailment are fundamentally claims for faulty performance under a contract. The parties'

bailment relationship arose under the Agreement and Limited Warranty. The Defendant did not have an extra-contractual duty to safeguard the Vehicle beyond its obligations in those agreements. Accordingly, the economic loss rule precludes the Plaintiffs' tort claims.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that the Defendant is entitled to summary judgment as to all of the Plaintiffs' claims. Accordingly, the Defendant's Motion for Summary Judgment is granted, the Plaintiffs' Motion for Partial Summary Judgment is denied, and this action is dismissed with prejudice.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 40] is **GRANTED**, and the Plaintiffs' Motion for Partial Summary Judgment [Doc. 42] is **DENIED.** The Plaintiffs' claims for cancellation under the Magnuson-Moss Act, breach of contract, breach of express warranties, unfair and deceptive trade practices (Chapter 75), negligence, and damage in bailment are **DISMISSED WITH PREJUDICE**.

A Judgment consistent with this Memorandum of Decision and Order shall be entered contemporaneously herewith.

The Clerk of Court is respectfully directed to close this civil action.

**IT IS SO ORDERED.**

Signed: September 28, 2026

Martin Reidinger
Chief United States District Judge